FILED

2022 Sep-14  AM 11:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| APRIL SEXTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   4:21-cv-00624-HNJ |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff April Sexton seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 11).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the listed impairments. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful

2

activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20 C.F.R. §§ 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also* 20

3

C.F.R. § 404.1520(g).   If the claimant cannot perform other work, the evaluator will find the claimant disabled.   20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'"   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g).   Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .   Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the

4

evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Ms. Sexton, age 42 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability income benefits on March 30, 2018, alleging disability as of October 31, 2017.   (Tr. 42, 211-12).   The Commissioner denied Sexton's claims, and Sexton timely requested review of the Commissioner's decision. (Tr. 111-37).   The Administrative Law Judge ("ALJ") held a hearing on August 27, 2020 (Tr. 40-90), and issued a decision on September 23, 2020, finding Sexton not disabled.   (Tr. 20-33).[2]

Applying the five-step sequential process, the ALJ found at step one that Sexton did not engage in substantial gainful activity between October 31, 2017, the alleged onset date, and March 31, 2020, her date last insured.   (Tr. 25).   At step two, the ALJ found Sexton manifested the severe impairments of status post left craniotomy for aneurysm, migraine headaches, post-concussional syndrome, gastroparesis, and anxiety disorder.   (Tr. 26).   At step three, the ALJ found that Sexton's impairments, or combination of impairments, did not meet or medically equal any impairment for

---

[2] The ALJ first convened a hearing on January 30, 2020, but she postponed the hearing without taking evidence because Sexton did not have representation and did not understand the proceedings.   (Tr. 91-106).

presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.*).

Next, the ALJ found Sexton exhibited the residual functional capacity ("RFC")

to perform light work as defined in 20 CFR 404.1567(b) except that she has the following non-exertional limitations that reduce her capacity to perform the full range of light exertion work:  She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ropes, ladders, or scaffolds.  She can never be exposed to high, exposed places or dangerous machinery.  She can tolerate occasional exposure to extreme heat or extreme cold.  She can have no exposure to vibration.  She can tolerate a moderate noise intensity level as defined in the DOT/SCO.  She can tolerate occasional exposure to light as bright as sunlight.  She can work at a consistent pace throughout the workday but not at a production rate pace where tasks must be performed quickly. She can sustain an ordinary job routine without special supervision.

 (Tr. 28).

At step four, the ALJ determined Sexton could perform her past relevant work as a retail sales clerk, retail manager, order clerk, and office manager.  (Tr. 32).  Thus, the ALJ determined Sexton did not suffer a disability, as defined by the Social Security Act, since October 31, 2017.  (Tr. 33).

Sexton timely requested review of the ALJ's decision.  (Tr. 202-07).  On March 15, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.  (Tr. 1-3).  On May 4, 2021, Sexton filed her complaint with the court seeking review of the ALJ's decision.  (Doc. 1).

## ANALYSIS

In this appeal, Sexton argues the ALJ improperly considered the opinion of Dr. Nadil Morrar, her treating physician, improperly evaluated her past relevant work, and posed a hypothetical question to the vocational expert that did not encompass all of her impairments.   For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.     The ALJ Properly Considered the Opinion of Sexton's Treating Physician

Dr. Nidal Morrar, Sexton's treating physician, completed a Mental Health Source Statement form on March 12, 2020.   The form required Dr. Morrar to circle "yes" or "no" in response to a series of questions.    In that fashion, Dr. Morrar indicated Sexton could understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; adjust to routine and infrequent work changes; interact with supervisors and/or co-workers; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.   She could not maintain attention, concentration, or pace for periods of at least two hours; she could not perform activities within a schedule and be punctual within customary tolerances; and her limitations did not date back to October 31, 2017.   Dr. Morrar expected Sexton to remain off-task zero hours during an eight-hour workday, other than normal workday breaks.   During a 30-day period, Dr. Morrar would not expect Sexton to fail to report to work any days due to her psychological symptoms.   She would experience

mild fatigue as a side effect of her medications.   (Tr. 789).

>   The ALJ found Dr. Morrar's opinions unpersuasive, stating:

>   They are not well supported, and they are not consistent with the other
>   evidence, including the claimant's current work activity.   In addition, the
>   opinions expressed on this form are internally inconsistent.   Dr. Morrar
>   first indicated that the claimant was unable to maintain attention,
>   concentration and/or pace for periods of at least two hours, but then he
>   reported that she would not be off task in excess of normal workday
>   breaks.   His opinions regarding the claimant's ability to perform activities
>   within a schedule and be punctual seem inconsistent with his report that
>   the claimant would not fail to report to work due to her psychological
>   symptoms.

(Tr. 31-32).

On January 18, 2017, the Commissioner revised the regulations governing the assessment of medical opinion evidence for claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867 (Jan. 18, 2017) (codified at 20 C.F.R. § 404.1520c).   Sexton's claims, filed on March 30, 2018, fall under the revised regulations.

Pursuant to the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."   20 C.F.R. § 404.1520c(a).   The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.   *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.   20 C.F.R. § 404.1520c(b)(2).   Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be."   20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.   20 C.F.R. § 404.1520c(c)(3)-(5).   The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.   20 C.F.R. § 404.1520c(c)(3)(v).   The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   20 C.F.R. § 404.1520c(c)(5).

Sexton argues that despite the regulatory revisions, the court still must follow Eleventh Circuit case law requiring deference to a treating physician's opinion, absent a showing of good cause to the contrary.  (Doc. 12, at 17-22; Doc. 15, at 2-7).  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  However, the Eleventh Circuit explicitly rejected that argument in *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 82, 898 (11th Cir. 2022).

The ALJ properly considered Dr. Morrar's assessment under the revised regulations.  First, the ALJ properly found Dr. Morrar's form contained internal inconsistencies, as Dr. Morrar opined Sexton could not maintain attention, concentration, or pace for at least two hours, yet she would not remain off-task at all, other than normal workday breaks.  She could not perform activities within a schedule or maintain customary punctuality, yet she would not fail to report to work at all due to her symptoms.

The ALJ also properly determined Dr. Morrar's opinions were not well supported.[3]  First, Dr. Morrar's own treatment records do not support his assessments.

---

[3] The Commissioner argues Dr. Morrar lacked support for his opinion because he "merely circled 'yes' and 'no' and provided no explanation for the limitations he reported."  (Doc. 14, at 18).  Sexton argues the Commissioner improperly considered the summary nature of Dr. Morrar's response under *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245 (2019) (per curiam).  In *Schink*, the Eleventh Circuit declared an ALJ should not discount a physician's opinion solely based upon the format in which the physician expresses the opinion.  *Id.* at 1262 ("The most that can be said in criticism of the questionnaires' format is that they used a 'check box' format with limited space for explanation of the assessments.  But that is not a basis, in and of itself, to discount them as conclusory.").  Rather, the ALJ should evaluate a physician's "answers to the questionnaires in light of their treatment notes."

Dr. Morrar assessed Sexton with post-concussion syndrome on May 14, 2012, after she fell down stairs and hit her head on May 8.  She continued to experience symptoms like headaches and dizziness on June 1, 2012.  (Tr. 536-41, 614-16).   On May 8, 2012, spinal and brain imaging revealed normal findings.   (Tr. 609-12).

On July 16, 2012, January 30, 2013, and June 25, 2013, she presented for either medication management or treatment for acute illnesses.   (Tr. 542-50).

On February 10, 2014, she reported headaches and pains in the left side of her head, but she maintained no desire to see her neurologist.   (Tr. 551-53).

On March 26, May 20, July 13, and November 9, 2015, she presented for medication management.   (Tr. 554-65).

On February 15, 2016, she reported the knot on the back of her head felt sore. (Tr. 566-68).

On April 25, 2016, she reported daily headaches.   (Tr. 569-72).

On May 16, 2016, she reported pain in her left ear and left side of her head after

---

*Id.*

However, the Eleventh Circuit decided *Schink* under the now-defunct treating physician rule, and no court has determined whether the Eleventh Circuit's statements about the summary nature of a physician's assessment should apply under the revised regulations governing opinion evidence.   This court need not reach that determination today, as the ALJ did not rely upon the "yes"/"no" nature of Dr. Morrar's form as a basis for finding the form unpersuasive.   And in any event, as discussed in the text, Dr. Morrar's treatment notes and the rest of the medical evidence do not support his assessments regarding Sexton's ability to maintain attention, concentration, and pace; perform activities within a schedule; and be punctual within customary tolerances.

bumping her head.   (Tr. 573-75).

On June 27, 2016, she reported pain and bruising to her left side and foot after falling on a boat.   The clinical examination revealed slowed gait with a limp and tenderness in the left foot and hip. (Tr. 576-79).   An x-ray revealed no acute radiographic abnormality.   (Tr. 607).

On September 13, 2016, she reported headaches and dizziness.   Dr. Morrar's file did not contain any notes from Sexton's neurologist, but Sexton reported she saw the neurologist within the year preceding her visit.   Dr. Morrar advised that bouncing around in ballet and boat rides might cause some of her symptoms, and Sexton planned to follow up with a local neurologist.   Her gait had stabilized since her last visit.   (Tr. 580-82).

On December 22, 2016, she reported she had to stop much of her work due to increasing headaches.   She believed she needed an MRI, and she planned to obtain a neurological evaluation when her insurance coverage commenced.   (Tr. 583-85).

On March 13, 2017, she reported continued daily headaches and nausea, especially after overwork.   She desired a reduction of her medications, and performing yoga improved her symptoms.   She also reported back and limb pain. However, the musculoskeletal examination produced normal findings.   (Tr. 586-88).

On May 19, 2017, she reported back pain, joint stiffness, limb pain, and muscle pain, but she worked full time at a tackle place watching over boats.   The clinical

examination produced normal findings. (Tr. 589-91).

On May 22, 2018, she reported experiencing an aneurysm in November 2017, and she continued to experience headaches.  She also experienced some ocular nerve damage during the surgery to repair the aneurysm.  Dr. Morrar referred her to a neurologist. (Tr. 592-95).

On July 20, 2018, she reported for a follow-up for her anxiety medications. CBD oil helped her headaches, muscle aches, and joint pain.  Her neurologist recommended she see an ENT for her ear pain.  She cut down some of her medications, and she underwent a CT scan on her neck due to pain.  The clinical examination produced normal findings.  Dr. Morrar referred her to an ENT.  (Tr. 596-99).

On September 21, 2018, she reported an upper respiratory infection.  (Tr. 600-02).

On November 30, 2018, Sexton presented for medication refills, and she reported arthralgias, back pain, joint stiffness, and limb pain.  She presented a normal physical examination except for lower back tenderness.  (Tr. 715-17).

On March 8, 2019, she presented with complaints of anxiety, depression, stress, mood swings, time management problems, and some obsessive-compulsive disorder symptoms.  She also experienced panic attacks several times a day after exposure to occupational stressors, public speaking, crowds or public spaces, and small or closed-in

spaces.   Dr. Morrar assessed anxiety disorder, unspecified, and obsessive-compulsive disorder, and he refilled Sexton's medications.   (Tr. 718-20).

On June 10, 2019, Sexton complained of diffuse muscle and joint pain, moderate in severity, and persisting for the previous five years.   The pain primarily affected her spine, shoulders, hands, fingers, knees, and ankles, as well as her trapezius and latissimus dorsi muscles.   Anxiety, stress, over-exercise, and lack of exercise exacerbated her symptoms.   She also reported daily anxiety.   The clinical examination produced normal findings.   Dr. Morrar refilled Sexton's medications for pain and post-concussional syndrome.   (Tr. 721-24).

On October 4, 2019, Sexton underwent an assessment for hypercholesterolemia. (Tr. 725-27).

On October 23, 2019, Sexton presented for treatment of an upper respiratory infection.   (Tr. 728-30).

On March 12, 2020, Sexton presented for a medication follow-up.   She stated she had returned to work full-time, and she worked some "weird" hours, not the same time every day.   She did not report gastrointestinal or psychiatric symptoms.   The clinical examination produced normal findings.   Dr. Morrar assessed post-concussional syndrome and anxiety disorder.   He stated Sexton denied a psychological or neurological evaluation, even though her mother reported she covered her house in post-it notes in an effort to remember things, as she "really doesn't want to interact

14

w/people outside of work."   (Tr. 786-88).

Dr. Morrar's records do not provide evidence of any consistent physical symptoms other than headaches.   And, they do not demonstrate Sexton experienced disabling headache symptoms, as she worked after the headaches commenced.   The records demonstrate Sexton regularly reported anxiety and other mental health symptoms, but they do not contain any information about how those symptoms affected her functionally.   The mere presence of those conditions does not support a finding of disability, as the functional effect of a claimant's impairments and symptoms governs the analysis.   *Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11ᵗʰ Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation.   However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard."); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11ᵗʰ Cir. 2010) (diagnosis insufficient to establish disability) (emphasis in original); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11ᵗʰ Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Importantly, as the ALJ observed, Dr. Morrar's records do not contain "objective evidence of memory or cognitive defects."   (Tr. 30).   The records therefore

do not provide support for Dr. Morar's conclusions that Sexton experienced deficiencies in attention, concentration, pace, performing activities within a schedule, and maintaining customary punctuality.

The other medical records also do not support Dr. Morrar's opinions about Sexton's mental functioning deficiencies.

Dr. Jyothiprasanna Tummala, an internal medicine specialist, treated Sexton both before and after her aneurysm repair surgery.   On November 28, 2017, three weeks after the surgery, Sexton reported her headaches had improved, but she still experienced neck pain, joint pain, and insomnia.   Other than Sexton's surgical scar, the clinical examination produced normal findings, including good insight and judgment, normal mood and affect, full orientation, normal muscle tone and motor strength, normal movement of extremities, intact cranial nerves, and normal muscle strength.   (Tr. 468-470).

On December 20, 2017, Sexton reported ear pain, intermittent vertigo, neck pain, stable anxiety, and sleep disturbances.   Other than fluid on her ear and a surgical scar, the clinical examination produced normal results, as on November 28.   (Tr. 465-68).

On February 28, 2018, Sexton reported the pain medication Tramadol did not work well for her, as it made her feel hyper.   She experienced increased anxiety attacks, and she passed a memory test, but she failed a therapy test.   She planned a follow-up with a neuropsychologist.   She experienced increased pain on the left side of her face

16

and left ear, but she had not yet completed a round of antibiotics for the ear infection. She reported taking more pain and anti-inflammatory medication recently, but it did not help. She asked for a prescription of Oxycodone. The clinical examination produced the same results as on November 28, 2017. (Tr. 462-65).

On November 21, 2017, Dr. Winfield Fisher, the neurosurgeon who repaired Sexton's aneurysm, conducted a follow-up appointment. Sexton reported she felt great the first five days after surgery, but after that she felt emotional and angry, believed her brain was "all over the place," and maintained trouble sleeping. Dr. Fisher recommended psychological testing, and he recommended Benadryl for sleep and Tylenol for pain.

On January 24, 2018, Sexton reported deep orbital pain, eye twitching, and left-sided jaw and ear pain. Dr Fisher stated Sexton was "doing well and is ready to go back to work but still needs to complete her neuropsychological testing." He did not plan to see her again for five years. (Tr. 645-59).

On March 6, 2018, Amy J. Knight, Ph.D., completed a neuropsychological examination to assess Sexton's cognitive and emotional status and ability to drive vis-à-vis a return to work. Dr. Knight concluded Sexton presented "a low risk for return to driving at this time." As to specific findings, Dr. Knight stated:

> Visual scanning was accurate and there was no evidence of spatial neglect. Speed and accuracy was sufficient on tasks of simple attention. Span attention was average as Ms. Sexton was able to repeat back up to 5

17

digits.   Working memory was intact for digits backwards (4 max) and in sequence (6 max). Visual perceptual processing speed was normal. Divided and selective visual attention tested within normal limits.   Ms. Sexton was able to attend to changing details in a series of pictures of driving situations in the high average range.   She was able to navigate a map when given verbal directions in the low average range.   Speed and accuracy were intact on a complex sequencing task requiring alternating responses and mental flexibility in the high average range.   Ms. Sexton performed well on a problem-solving task involving visuospatial abilities, spatial orientation and multitasking for placing cars and trucks correctly on a grid.   She performed well on a conceptual task involving matching road signs to driving situations.

(Tr. 501-02).

On May 31, 2018, Sexton attended a counseling session with Rebecca Washburn, a Licensed Professional Counselor, but she did not return for any additional sessions. (Tr. 790).

On July 9, 2018, Sexton saw neurologist Richard A. Friedman for relief from migraine headaches.   The clinical examination produced normal results, and a cervical spine CT scan displayed no evidence of acute intracranial abnormalities.   (Tr. 620-26).

On July 26, 2018, Sexton presented to Eastern Shore ENT Clinic with complaints of left ear pain.   Dr. Norris attributed her persistent pain to TMJ inflammation and suggested she follow up with a dentist or oral surgeon.   (Tr. 737-39).

As with Dr. Morrar's records, these records demonstrate Sexton continued to experience some neurological and psychological symptoms after her aneurysm repair surgery, but they do not support Dr. Morar's conclusions that Sexton experienced

deficiencies in attention, concentration, pace, performing activities within a schedule, and maintaining customary punctuality.   The objective findings reflect mostly normal assessments, and Dr. Fisher stated Sexton could return to work.

In summary, the ALJ properly considered Dr. Morrar's assessment pursuant to the revised regulations for evaluating medical opinions, focusing particularly on the supportability and consistency of the assessment.   Moreover, substantial evidence, as fully discussed in this section, supported the ALJ's finding.

## II.   The ALJ Properly Considered Sexton's Past Relevant Work

Sexton argues substantial evidence does not support the ALJ's finding that she can perform her past work as a retail sales clerk, retail manager, order clerk, and office manager, both as those jobs are generally performed in the national economy and as Sexton performed them.   Sexton argues the ALJ erred because he did not "consider all of the duties of [Sexton's] past work and evaluate [her] ability to perform those duties in spite of the impairments."   (Doc. 12, at 22).

The ALJ must determine whether a claimant can perform her past work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 404.1560(b)(2).   That determination must include a specific "finding of fact as to the physical and mental demands of the past job/occupation." SSR 82-62, 1982 WL 31386, at *4; *see also Nelms v. Bowen*, 803 F.2d 1164, 1165 (11th Cir. 1986) ("In the absence of evidence of the physical requirements and demands of

19

appellant's work the ALJ could not properly determine that she retained the residual functional capacity to perform it.").   To gather the pertinent information, the ALJ may rely upon the claimant's testimony, the testimony of other people familiar with the claimant's work, the testimony of a vocational expert, and/or the Department of Labor's Dictionary of Occupational Titles (DOT).   20 C.F.R. § 404.1560(b)(2).

The ALJ followed those requirements.   Sexton did not submit a Work Function Report, but during the administrative hearing, she testified that as a property manager for Poole & Associates, she managed vacation rentals by ensuring cleanliness, supervising maintenance, preparing the properties for guests, and processing paperwork.   As a property manager for Kaiser Realty, she performed similar duties, but she also maintained responsibility for keeping the properties stocked and clean, ensuring guests' satisfaction, and managing guests' needs during their stay.   As a retail manager and sales clerk at Blue Lagoon and HL Hood, she counted inventory, managed sales, and created a work schedule for other employees.   As an office manager at Windows Décor & More, she organized work schedules, ordered fabric and window treatments, scheduled installations, kept the company's books, and opened and closed the store.   (Tr. 52-57).

After garnering that testimony from Sexton, the ALJ consulted a vocational expert to classify Sexton's past relevant work pursuant to DOT guidelines.   The vocational expert classified Sexton's past work as an order clerk and office manager at

the sedentary level of exertion, and he classified Sexton's past work as a retail cashier, rental agent, retail sales clerk, and retail manager at the light level.   (Tr. 84).   Sexton's briefs fail to identify any particular requirement of her past relevant work that the ALJ overlooked, and she has not challenged the qualifications or testimony of the vocational expert.

Because the ALJ relied upon Sexton's hearing testimony, the vocational expert's testimony, and the DOT classifications, the court finds she obtained sufficient information to appropriately classify Sexton's past relevant work.   *See Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 695 (11th Cir. 2020) (citing 20 C.F.R. § 404.1560(b)(2)) ("In evaluating the demands of a claimant's past work, an ALJ may rely on the job descriptions set forth in the Dictionary of Occupational Titles (DOT) to determine the level of the work (from sedentary to very heavy) it required, as well as the claimant's own account of the work."); *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 900 (11th Cir. 2019) (The ALJ appropriately relied on the claimant's testimony, his work history report, vocational expert testimony, and DOT descriptions to "paint a full picture of [the claimant's] past relevant work."); *Waldrop v. Comm'r of Soc. Sec.*, 379 F. App'x 948, 953 (11th Cir. 2010) ("[A]n ALJ may properly consider information in the DOT and a VE's testimony in determining whether a claimant can still perform her past relevant work."); *Savor v. Shalala*, 868 F. Supp. 1363, 1365 (M.D. Fla. 1994) ("[I]t is clear that the ALJ did determine the physical demands of the Plaintiff's past work and

her ability to perform that work in light of her impairment.  The ALJ accomplished this by eliciting the opinion of a vocational expert.").

To the extent Sexton challenges the ALJ's finding that she possessed the residual functional capacity to perform a limited range of light work, she offers no substantive argument or evidence to support that challenge.  Thus, she has not satisfied her "burden of proving that [s]he is unable to perform [her] previous work." *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986) (citing *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)).

Moreover, substantial evidence supports the ALJ's finding.  As detailed fully in the previous section, the record demonstrates Sexton suffered some lingering symptoms after her aneurysm repair, but the objective medical evidence does not portray she suffered any more significant functional limitations than the ALJ assessed.

## III.   The ALJ Properly Included All Supported Limitations in the Hypothetical Question to the Vocational Expert

"'In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'"  *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam)). However, "'[t]he ALJ is not required to include findings in the hypothetical that the

ALJ has found to be unsupported.'"  *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11ᵗʰ Cir. 2004)).

The ALJ's hypothetical question to the vocational expert mirrored her residual functional capacity finding.  (Tr. 28, 85).  Sexton asserts the question did not include a "correct or full statement of [her] limitations and impairments," and it "did not accurately state [her] pain level or her residual functional capacity [sic] her post left craniotomy for aneurysm, migraine headaches, post-concussional syndrome, gastroparesis, and anxiety disorder."  (Doc. 12, at 27-28).  However, as previously discussed, the mere presence of those conditions does not support a finding of disability, as the functional effect of Sexton's impairments and symptoms governs the analysis.  *Moore,* 405 F.3d at 1213 n.6 (citing *McCruter*, 791 F.2d at 1547); *Mansfield* 395 F. App'x at 531; *Osborn*, 194 F. App'x at 667.

Moreover, the ALJ's RFC finding included some limitations – including avoiding production rate pace, avoiding heights and certain postures, and limiting light exposure – that address the limitations the ALJ perceived in Sexton.  (Tr. 28).  The court cannot discern from the record any limitations the ALJ could have included that would change the disability finding, other than those limitations the ALJ properly considered unsupported.  Accordingly, the court concludes the ALJ included all of Sexton's supported impairments in the hypothetical question to the vocational expert, and she properly relied on the vocational expert's testimony.

23

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

The court will enter a separate final judgment.

**DONE** this 14th day of September, 2022.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE